# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**In re Estate of Walsh, 2012 IL App (2d) 110938**

---

| | |
|---|---|
| Appellate Court Caption | *In re* ESTATE OF WILLIAM E. WALSH, Deceased (Paul Kowsikoff, Plaintiff-Appellant, v. Estate of William E. Walsh, Defendant-Appellee). |
| District & No. | Second District<br>Docket No. 2-11-0938 |
| Filed<br>Rehearing denied | June 25, 2012<br>July 24, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A finding was properly directed against plaintiff on his claim against decedent's estate, where plaintiff failed to rebut the presumption that the services he performed for decedent and decedent's business were performed gratuitously, notwithstanding the existence of a near-familial relationship between plaintiff and decedent. |
| Decision Under Review | Appeal from the Circuit Court of McHenry County; No. 08-PR-193; the Hon. Michael J. Sullivan, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Robert P. Smyth, of Grayslake, for appellant.

David M. Lutrey and Jeffrey P. O'Kelley, both of Lesser, Lutrey &
McGlynn, LLP, of Lake Forest, for appellee.

Panel

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Presiding Justice Jorgensen concurred in the judgment and opinion.
Justice McLaren dissented, with opinion.

**OPINION**

¶ 1      This case involves a claim against the estate of the decedent, William E. Walsh. The claimant, Paul Kowsikoff, alleged that he performed upholstering services while in the decedent's employ and also provided caretaking services to the decedent, and that he was never paid for any of these services. After Paul presented his evidence at trial, two of the heirs moved for a directed finding in favor of the estate. The trial court granted the motion, and Paul appeals. For the following reasons, we affirm.

¶ 2                                  BACKGROUND

¶ 3      The facts set out below are taken from the record and the evidence that was introduced at trial. Except as noted, they are uncontradicted. The decedent worked as an upholsterer and had his own shop. He and his first wife, Ann, divorced in the 1970s. Four children were born of that marriage: Kathleen, William, Jr., John, and Tammy. The decedent later married his second wife, Naomi (known as "Kelly"). No children were born of that marriage. Kelly died in 1999.

¶ 4      The decedent died on June 24, 2008. His estate was opened a few weeks later. No will was submitted and the only heirs recognized were the decedent's four children. The estate included, among other things, several pieces of real property, valued at a total of $2,667,000 and subject to mortgages totaling $716,537.66; about $132,000 in cash; and personal property including cars, furnishings, and jewelry. On January 23, 2009, Paul filed a claim against the estate, seeking $387,832.50 as payment for upholstery services performed for the decedent's upholstery business during the previous five years (from January 25, 2004, through the date of the claim) and $7,840 for caretaking services rendered to the decedent shortly before his death. Other claims filed against the estate included a bank's claim for money owing on the loans secured by the mortgages, and two claims filed by David Clark and the decedent's son John for unpaid building repair and rehabilitation services.

¶ 5      Paul testified that in 1981 he came to the United States from Germany, where he had been an ironworker. Looking for work, he walked into the decedent's upholstery shop in Chicago and asked him for work. Kelly was present and urged the decedent to give Paul a

-2-

chance, although Paul knew nothing about upholstery at the time. The decedent and Kelly taught Paul how to disassemble and reassemble furniture. Paul's testimony that he was employed by or performed services for the decedent was objected to on the ground of the Dead-Man's Act (735 ILCS 5/8-201 (West 2010)) and was stricken, as was his testimony that he did not receive any payment in return for his labor. However, Paul was able to testify that no one other than the decedent ever paid him for his upholstery work. He also testified that, outside of the decedent's presence, he refinished furniture, answered the phone, and upholstered furniture in the decedent's Chicago shop for the next two years.

¶ 6    At the end of those two years, Paul moved in with the decedent and Kelly at 1591 West Dundee Road in Palatine, a building that housed a workspace as well as a home. The decedent also had a shop in Palatine. Paul upholstered chairs and sofas, refinished antiques, and answered the business phone daily from 8 a.m. to midnight. From the decedent, Kelly, and the decedent's son John, Paul learned the craft of upholstery to the point that he was no longer an apprentice but became a "craftsman" who could work independently. Beginning in about 1989, when the decedent was not at the shop Paul collected payments from customers, always in check form. He gave these payments to the decedent and never kept any of them. According to Paul's answers to interrogatories, the decedent gave him gifts on his birthdays and on holidays, and gave him a gold ring with what appeared to be a diamond in 1984. Paul continued to live with the decedent and Kelly and work for the decedent's upholstery business, American Upholstery and Refinishing, for the next 15 or 16 years.

¶ 7    After Kelly died in 1999, Paul became the decedent's "right-hand person." About that time, the decedent sold the shop and the home in Palatine and bought a house at 8512 Route 120 in Wonder Lake. As before, Paul lived with the decedent. The decedent and Paul set up a workshop in the basement and stored fabrics and other supplies there. Paul worked out of the basement daily from early in the morning until late at night.

¶ 8    In 2004, the decedent bought a store at 4611 Elm Street in McHenry. He and Paul moved all of the fabric and supplies from the basement of the Wonder Lake house to the McHenry store. Paul continued to work for the decedent in the McHenry store. Paul did not have a car or a driver's license; he was driven to and from work by the decedent or John (who also worked out of the McHenry store for his own upholstery business). Paul was usually alone in the store all day, as the decedent would drop him off and go elsewhere. He worked approximately 14 hours per day, 7 days a week, and on holidays. He wrote out orders for upholstery jobs, ordered supplies, paid for them with checks written by the decedent, signed for deliveries, did the upholstering, and answered the phone. However, he did not keep the books for the business.

¶ 9    Paul introduced into evidence several bills and invoices that reflected deliveries to American Upholstery at the addresses Paul had identified as addresses where the decedent and he had operated their upholstery business. Several of the invoices from Metro, an upholstery supply business, listed "American Upholstery, Bill and Paul Walsh" as the business and persons to which the orders would be billed and shipped. Paul testified that this listing was not correct; Bill Walsh (the decedent) owned the business, and he (Paul Kowsikoff) managed it. The evidence also included handwritten customer orders for upholstery services, with "American Upholstery" and the business phone number written

across the top. Paul testified that throughout the five-year claim period the decedent paid for Paul's Nextel cell phone, which was the business phone, and also Paul's health insurance. The phone bills admitted into evidence showed that the decedent was billed under his own name for the phone. The insurance bills were directed to Paul individually and bore handwritten notations that they had been paid by "business checks."

¶ 10    Paul was familiar with the corporation Honora Woods, which he described as a woodworking company formed by the decedent during a period when the upholstery business was slow. Paul stated that he was not employed by Honora Woods, however. He worked for the decedent and American Upholstery.

¶ 11    Paul also performed other services for the decedent. At the Wonder Lake house, Paul cooked, cleaned, and did the laundry and yard work. According to his answers to interrogatories, he provided these services in exchange for room and board. He accompanied the decedent grocery shopping. The decedent would pay for the groceries and Paul would cook the dinners, which were "a lot of pizza" and "small dinners." Paul also made coffee and breakfast for the decedent in the morning; Paul generally did not eat lunch. Paul did not go shopping by himself; according to him, he had no money, because he never got paid.

¶ 12    When Paul and the decedent first moved into the Wonder Lake house, the decedent wanted to clear a portion of the property, and Paul cut down approximately 200 trees with trunks ranging in size from three feet in diameter (about 10 of these) to young trees no bigger than sticks. A neighbor, Richard Buchert, described the Wonder Lake property as being about 14 or 15 acres, with a "very large" house having four or five bedrooms and an indoor swimming pool. Buchert had been inside the house. Paul had his own bedroom, with a television. Buchert stated that Paul did "all the work around the house" and confirmed that Paul cut down 200 trees over the course of about one year; Buchert used his tractor to help stack the wood, and in exchange Paul reupholstered the seats on Buchert's Jeep and did some other work in his home. Buchert, who stated that he and Paul "got to be good friends," also confirmed that he had seen Paul working in the McHenry store before 8 a.m. and after midnight, and stated that Paul "did all the upholstering." He saw Paul dealing with customers, and saw him take both cash and checks from customers paying for upholstery jobs. He did not see what Paul did with the cash.

¶ 13    Paul also worked in other ways as directed by the decedent. For instance, he worked on property the decedent owned in Union, as did John and David Clark. He painted some of the rooms in Tammy's house in St. Charles. Tammy did not pay him for this.

¶ 14    In January 2008, the decedent became ill with what first appeared to be a bad cold and he began coughing up blood. Eventually, it was learned that the decedent had cancer, and he died from it in June 2008. In May 2008, Paul began providing personal care to the decedent, cleaning his bed and otherwise taking care of him.

¶ 15    The day after the decedent died, Tammy came to the house and went from room to room looking around. Two days later, Kathleen called Paul while he was at work and told him that she and Tammy were at the house. He called John, who advised him to return home. Paul got a ride to the house from a neighbor. When he got there, Tammy and Kathleen were in his bedroom with a locksmith. They were working on opening the safe that was located in the

closet of the bedroom. The safe had belonged to the decedent; it was moved into Paul's closet in 2000 or so. Paul did not know the combination and had thought it was empty. Paul called the police. When he was allowed back into the house, the safe was open and empty. Afterward, Paul called a locksmith and had the locks to the house changed. At some point after the decedent's death, Tammy went to the McHenry store with the administrator of the estate and took a folder of documents, including invoices, receipts, and business records, from the desk there.

¶ 16    Paul then attempted to introduce, as evidence that the decedent intended him to receive something for his upholstery work, a document with the heading "Last Will and Testament of William E. Walsh and Naomi A. Walsh." The document was handwritten and bore the date January 17, 1996. Paul first saw it in 1996. Paul's testimony that the decedent gave him the document was stricken under the Dead-Man's Act. Paul testified that the writing on the document was Kelly's; he had seen her handwriting and signature, as well as those of the decedent, on work orders and insurance forms. Paul attempted to testify that he recognized the decedent's and Kelly's signatures on the document, but the trial court sustained an objection to this testimony (which presumably was proffered to lay a foundation for admission of the document) as hearsay, and told Paul's attorney to move on. The document was not admitted into evidence. However, a copy of it was attached as an exhibit to certain interrogatory answers that were filed in connection with a motion, and thus it is part of the record on appeal. The document stated, among other things, that the home and property at 1591 West Dundee Road in Palatine were to be given to Paul after the decedent's death, along with $150,000.

¶ 17    John testified on behalf of Paul. He was experienced in the upholstery business and considered himself a master upholsterer. In the last 20 years, he had known three other master upholsterers: his brother Bill (William), his "brother" Ray (not otherwise identified in the record), and Paul. He formed the opinion that Paul was a master upholsterer in the late 1980s. He was aware of the hourly rates charged by master upholsterers in Chicago and the northern suburbs. In 2004, a master upholsterer would have been paid $22.50 to $23.25 per hour. In 2008, a master upholsterer could command $25 per hour. John had lived with the decedent through 1986, and he stated that he and Paul had worked late on many nights. Paul typically worked on weekends and holidays. For instance, Paul was in the basement of the Wonder Lake house working on New Year's Eve of 2004. John gave repeated examples of Paul working on various holidays and weekends and late at night.

¶ 18    Tammy testified as an adverse witness. Beginning in 1999, she would help the decedent with the books for his business from time to time, whenever he asked for such help. The decedent paid her for the time she spent doing this, although he never gave her a W-2 form for filing taxes. She would write checks for the business and pay bills. She never wrote any checks to Paul. Tammy was asked to recall her deposition testimony to the effect that Paul had been paid for all the work he had done and to explain how she believed that had occurred. Tammy repeatedly refused to answer the question, stating that she did not understand it or did not know or could not answer.

¶ 19    When Tammy and Kathleen went to the decedent's house after his death and opened the safe, there was more than $80,000 in cash in it, and jewelry. Tammy did not see any papers

in the safe. When Kathleen testified, she confirmed that there was cash (more than $100,000) and jewelry in the safe, and maybe some keys, but no papers. Kathleen gave the cash to the administrator, although she withheld $5,000 to hire an attorney. She later repaid this money to the estate.

¶ 20    Kathleen testified that she first met Paul in 1983, at her grandmother's funeral. She recalled Paul living with the decedent and Kelly on Dundee Road in Palatine. The decedent and Paul were doing upholstery work out of the home. She also saw Paul working out of the shop in Palatine, and also out of the McHenry store. She had been inside the Wonder Lake house, although never when the decedent was absent. She thought Paul's bedroom was about 12 feet by 12 feet. (Paul testified that his bedroom was 20 feet by 20 feet.) When asked whether it was her position that Paul "had gotten paid everything he's going to get paid" for the work he had done during the claim period, Kathleen stated, "Well, I think it just defies logic that anybody would work for nothing."

¶ 21    Timothy Janisch, a boat salesman, testified that he had known Paul since about 2004, because the used boats his employer sometimes sold often required reupholstery. From 2004 to 2008, he encountered only Paul in the McHenry store; he did not get to know the decedent until 2008. He would see Paul in the store early and "very very late." Janisch always paid for the upholstering jobs for the boats with checks made payable to American Upholstery.

¶ 22    Robert Kerbs, Jr., met the decedent in 1994, when Kerbs and his family had just started his current business, Metro Upholstery Supply. Kerbs testified about his own process of learning upholstery through an apprenticeship with his father. He worked as an upholsterer full-time from 1989 through 1993, and part-time from 1994 to 1996. At the end of that time, he was a journeyman upholsterer, not a master upholsterer. However, in his job providing supplies to upholsterers, he had become familiar with dozens of local upholsterers. Kerbs was accepted by the trial court as an expert on the quality of upholstery work and the prevailing wages in the upholstery business in McHenry. Kerbs opined that Paul was a competent upholsterer with happy customers and repeat business. From 2005 through 2008, upholsterers like Paul were paid $15 to $18 per hour, both in McHenry and in Chicago. During this period, Paul was the only one doing upholstery work in the McHenry store.

¶ 23    David Clark testified that he had met the decedent about 15 years earlier, through John. He met Paul at the same time because Paul and the decedent "were inseparable" and "were always together." In his testimony, Clark frequently referred to the decedent as Paul's "father" or "dad" rather than "Mr. Walsh," and he testified that "they" (Clark and either Paul or John, it is unclear) often referred to the decedent in this way when talking about him. Clark assisted in rehabilitating some houses for the decedent, billing him $15 per hour. Paul helped Clark on occasion, when directed to do so by the decedent. Paul worked with Clark on the house in Union for some portion of 2004, and he probably was not working 14 hours per day in the McHenry shop when he was working on the house. However, Paul worked 14 hours per day on whatever the decedent wanted him to do. Clark had filed a claim for about $8,500 against the estate for work he had done for the decedent that he had not been paid for. He settled the claim for $4,000. At one point, Clark had tried to get the decedent to sign a written agreement for the work Clark was doing. The decedent refused and said he did not sign any agreements.

¶ 24 James Ketchmark, an accountant, testified that he prepared individual and corporate tax returns for the decedent in 2004 and 2005. In doing so, he relied on information provided by the decedent; he did not conduct an audit of the decedent's business. The corporation was Honora Woods, which Ketchmark understood to be the name of the decedent's upholstery business. The corporation reported gross income of $133,657 in 2004 and $126,184 in 2005. The corporation listed expenses for medical insurance and a Sprint cell phone on its returns. Ketchmark did not recall any expenses for salaries on either the individual or the corporate tax returns, or any other reflection of any compensation paid to Paul. Around the time Ketchmark initially started handling the decedent's returns, he had a conversation with the decedent in which Ketchmark asked about the lack of payroll expenses and the decedent said "that was being taken care of." Ketchmark understood this to mean that the employees were being paid in cash, although the decedent did not actually say that. Ketchmark believed that any bills for the upholstery business were being paid out of Honora Woods.

¶ 25 Gerald Helt worked at the Harvey State Bank, which was the original administrator of the decedent's estate. He arranged for tax returns to be filed by the estate. He was familiar with the 1041 return form, which he had filed many times on behalf of clients, but was less familiar with the 706 form, which he had seen only a handful of times before. The estate initially filed a 706 return in September 2009 that did not list any of the claims against the estate except for the bank's claim based on the loans secured by mortgages. Helt was then contacted by the bank's attorney and its accountant, who told him that the other claims should be listed. In October 2009, the estate filed a supplemental 706 form that listed Paul's claim, as well as the claims filed by John and Clark. The form had three columns in which claims could be listed. All of the claims, including Paul's, were listed as deductions from the estate rather than being listed in either the "unpaid" column or the "amount in contest" column. As a result, the net value of the estate was decreased, and the estate received a refund of much of the tax that had been paid. Helt signed both of the 706 returns.

¶ 26 Helt testified that he "probably" intended the inclusion of Paul's claim on the supplemental 706 form to have the same impact as allowing the claim, but he was not sure and primarily relied on the advice of the bank's attorney and accountant. He was not sure whether, if he thought the claim was invalid, he would have listed the claim in the "contested" column. He personally thought the claim might have some validity, but he was not sure. He viewed the administrator's role as being neutral in disputes among the heirs, whom he characterized as "very contentious." (The record reflects that the administrator did not file either an objection to or an allowance of the claim. The only objections to Paul's claim were filed by Tammy and Kathleen.) Helt confirmed that he went to the McHenry store with Tammy after the decedent's death, where they went through some records that were in a two- or three-drawer file cabinet. He did not know if Tammy had taken any papers from the store.

¶ 27 Paul rested his case after presenting the testimony above, which extended over five afternoons between November 30, 2010, and February 2, 2011. Tammy filed a motion for a directed finding pursuant to section 2-1110 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1110 (West 2010)), arguing that Paul had not proved the existence of an express contract, a contract implied in fact, or a contract implied in law. Kathleen joined in the

motion. The motion was fully briefed and was orally argued before the trial court.

¶ 28    On August 19, 2011, the trial court issued a 10-page typewritten order granting the motion and entering a directed finding denying the claim. The trial court began by noting that, under section 2-1110, a court must follow a two-step process. *In re Estate of Etherton*, 284 Ill. App. 3d 64, 67 (1996). The court first determines whether the plaintiff has made out a *prima facie* case on his claim–that is, whether he has produced at least some evidence regarding each element of his claims. *Id.* If not, then the defendant is entitled to judgment as a matter of law. If, however, the plaintiff has made out a *prima facie* case on his claim, then the court must proceed to the second step in which it weighs the evidence. *Id.* at 67-68. In weighing the evidence, the court must consider "the credibility of the witnesses and the weight and quality of the evidence." 735 ILCS 5/2-1110 (West 2010). The court then may either enter judgment for the defendant (if it finds the evidence insufficient to establish the claim) or deny the motion and proceed with the defendant's case. *Etherton*, 284 Ill. App. 3d at 68.

¶ 29    In its order, the trial court applied this two-step process. It first determined that, although Paul had not put forth a *prima facie* case regarding either an express contract or a contract implied in fact, Paul had presented sufficient evidence to make out a *prima facie* case on a claim sounding in *quantum meruit*, also described as unjust enrichment or a contract implied in law. In determining that there was a *prima facie* case on the *quantum meruit* claim, the trial court gave Paul the benefit of the following presumption: "The law presumes [that] services knowingly and voluntarily accepted by a decedent during the decedent's lifetime from nonfamily claimants [were] performed with an expectation of receiving compensatory payment." *Id*.

¶ 30    In proceeding to the second step, the trial court found that three of the four elements of a *quantum meruit* claim had been established: Paul provided services to the decedent; the decedent accepted those services; and there was no evidence of any payment to Paul. The case turned upon whether Paul had established the final element: that he did not perform the services gratuitously. The trial court noted that, at this second stage, it would have to weigh the evidence, which might result in the negation of the presumption applied during the first stage.

¶ 31    Weighing the evidence, the trial court ruled that the presumption of nongratuitous service was burst by the evidence of a lengthy and close relationship between Paul and the decedent, in which Paul lived with the decedent for over 25 years. The trial court found that this relationship was sufficiently similar to a familial relationship that it raised the contrary presumption: that services rendered to a decedent by a family member were gratuitous. See *In re Estate of Milborn*, 122 Ill. App. 3d 688, 692 (1984). In light of this presumption of gratuitous service, Paul could " 'only recover by showing an express contract for wages or proving such circumstances as [would] reasonably imply such [a] contract.' " *In re Estate of White*, 15 Ill. App. 3d 200, 202 (1973) (quoting *Collar v. Patterson*, 137 Ill. 403, 407 (1891)). Paul could not show this, and therefore his claim was denied. Paul filed a timely notice of appeal.

¶ 32                                    ANALYSIS

¶ 33    On appeal, Paul does not dispute the trial court's findings that he did not make out a *prima facie* case of express contract or contract implied in fact. He challenges only the trial court's determination that, although he made out a *prima facie* case of *quantum meruit*, he ultimately did not establish the claim's element of nongratuitous service. Paul also asserts that the trial court wrongly held that the heirs had not waived the application of the Dead-Man's Act. Because this latter assertion affects the evidence that may be considered in weighing the claim, we address it first.

¶ 34                                The Dead-Man's Act

¶ 35    Section 8-201 of the Code (735 ILCS 5/8-201 (West 2010)), known as the Dead-Man's Act (Act), among other things limits the evidence that may be introduced at trial when one of the parties is a decedent's estate. In that situation, the Act bars anyone directly interested in the action from testifying on his own behalf regarding any conversation with the decedent or other event that took place in the decedent's presence. 735 ILCS 5/8-201(a) (West 2010). The statute provides that its protections may be waived if anyone testifying on behalf of the estate testifies, or introduces other evidence, regarding a conversation or event covered by the Act. In that case, the door has been opened, and any interested person may testify about the same conversation or event. *Id.*

¶ 36    Paul argues that the estate and the heirs waived the right to object on the basis of the Act to his testimony about his conversations with the decedent and events that took place in the decedent's presence. Paul contends that this occurred when Kathleen brought a motion to bar one of Paul's witnesses and attached, as an exhibit to the motion, Paul's answers and amended answers to Tammy's interrogatories. These interrogatory answers contained Paul's verified statements about conversations he had with the decedent and actions that took place in the decedent's presence. In addition, the handwritten document purported to be the 1996 will of the decedent and Kelly was included as an attachment to these interrogatory answers and was thereby included in the exhibit to Kathleen's motion to bar. (Prior to Kathleen's inclusion of them with her motion, these answers to Tammy's interrogatories had not been filed with the court.) Kathleen attached the answers and amended answers to her motion because she was arguing that Paul had not disclosed a particular witness until after trial had commenced, when Paul filed his final set of amended answers. Kathleen did not assert that Paul's statements in his interrogatory answers were true or otherwise adopt them.

¶ 37    We are not aware of any case in which a claimant's own statements, merely attached as an exhibit to a motion, have been held to be the equivalent of testimony or other evidence propounded *by a representative of the estate*, as would be required for a waiver of the Act. Nor has Paul directed us to any case law holding that the protections of the Act are waived under these circumstances. Illinois Supreme Court Rule 341(h)(7) requires parties to cite relevant authority in support of their arguments, and when a party does not offer meaningful authority in support of his argument, that argument is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Sept. 1, 2006); *Mikolajczyk v. Ford Motor Co.*, 374 Ill. App. 3d 646, 677 (2007). Moreover, the estate asserts that this argument is forfeited because it was not raised before the trial

court. Paul has not responded to this assertion. A reviewing court will not consider arguments that were not presented to the trial court. *Hytel Group, Inc. v. Butler*, 405 Ill. App. 3d 113, 127 (2010). For both of these reasons, we find that this argument has been forfeited.

¶ 38          Near-Familial Relationship and the Presumption of Gratuitous Services

¶ 39       We turn to the issue of the differing presumptions that apply to claims for services rendered to a decedent. As the trial court noted, when the claimant is not related to the decedent, the law presumes that the services were provided with the expectation that they would be paid for by the decedent. *Etherton*, 284 Ill. App. 3d at 68. However, when the services were provided to the decedent by a family member, the presumption is that the family member provided the services gratuitously, without expectation of payment. *Id.* at 68-69; see also *Milborn*, 122 Ill. App. 3d at 692. As explained in *Milborn*, "[b]lood kinship is not necessary in order to raise" the presumption of gratuitous service: it "rests upon the idea of mutual dependence" and can arise when distant kin or unrelated persons "live together as members of one family" or otherwise demonstrate a relationship resembling that of immediate family members. *Milborn*, 122 Ill. App. 3d at 692; *White*, 15 Ill. App. 3d at 202. The trial court's determination that Paul and the decedent shared a near-familial relationship was a factual one, made at the second step of the section 2-1110 process after weighing the evidence. Accordingly, we will not overturn that determination on review unless it is contrary to the manifest weight of the evidence. *Etherton*, 284 Ill. App. 3d at 68.

¶ 40       The trial court here relied primarily on *White* in concluding that Paul and the decedent shared a relationship of mutual dependence that was familial in nature, even though Paul was not related to the decedent. In *White*, 15 Ill. App. 3d at 201, the claimant's husband Harry was the brother of the decedent's wife. The claimant (Eva) and Harry lived with the decedent following the death of the decedent's wife. Eva provided housekeeping services, cleaning, cooking, and doing laundry for everyone in the household. *Id.* Four years after Eva and Harry began living with the decedent, Harry died. Eva continued to live with the decedent, keeping house for the two of them, until the decedent's death 11 years later. Eva then filed a claim with the decedent's estate, seeking payment for the previous five years of housekeeping services. *Id.* After a bench trial, the trial court allowed the claim but awarded Eva less than she sought. Eva and the estate filed cross-appeals.

¶ 41       The appellate court in *White* reversed on the ground that the evidence established that Eva and the decedent shared a near-familial relationship despite the fact that they were not blood kin to each other. *Id.* at 202. Accordingly, Eva's claim was subject to the same presumption of gratuity that arose between family members. *Id.* That presumption could be overcome only by " 'showing an express contract for wages or proving such circumstances as reasonably imply such [a] contract.' " *Id.* (quoting *Collar*, 137 Ill. at 407). The appellate court explained that " '[s]uch circumstances as reasonably imply such a contract' " meant evidence that "the services were rendered upon the expectation of receiving pay therefor[ ] on the one side, and under the expectation of paying therefor on the other side, all at the time services were rendered." *Id.* The *White* court then noted that "[t]here are many factors which will rebut or corroborate the presumption of gratuity" and listed several such factors. *Id.* In

*White*, Eva had not produced any evidence that would rebut the presumption. *Id.* at 203. Thus, she could not recover on her claim for housekeeping services.

¶ 42   In *In re Estate of Sewart*, 274 Ill. App. 3d 298 (1995), the court also applied the presumption of gratuity to a claimant who was not related to the decedent. In *Sewart*, 274 Ill. App. 3d at 300, the claimant and her husband were very close friends with the decedent. They visited the decedent weekly and would do laundry, clean the house, and perform other chores. The claimant's daughter testified that the decedent was often invited to family events and was " 'family to us.' " *Id.* at 310. Witnesses testified that the decedent was grateful for the things that the claimant and her husband did for the decedent, and in 1976 the decedent spoke with his attorney about drafting his will to leave the bulk of his estate to the claimant's husband (although the decedent apparently did not want to leave anything to the claimant in the event that her husband predeceased the decedent, which in fact occurred). However, the claimant testified in deposition that the services that she and her husband performed for the decedent were not done with the expectation of payment nor was there any agreement that the decedent would make a will in their favor; rather, the services were provided out of friendship and close feelings. This deposition testimony was used to impeach her trial testimony to the contrary.

¶ 43   The trial court disallowed the claim, and the appellate court affirmed. The appellate court noted the near-familial relationship between the claimant's family and the decedent. Although it did not mention the presumption of gratuity that applies to services provided by family members, the court held that the "extended familial relationship" between the parties took the case outside of the ordinary presumption of nongratuity that applied where there was no family relationship. *Id.* For this reason, as well as because of the claimant's own statements denying that she or her husband expected reward for their services to the decedent, the claimant could not recover.

¶ 44   With these cases in mind, we believe that the trial court did not err in finding that Paul and the decedent shared a near-familial relationship that raised the presumption of gratuity. Just as in *White*, Paul and the decedent shared a household for many years, and Paul's performance of home maintenance while the decedent paid for the home and their food showed the "mutual dependence" that is the essence of a familial relationship. Moreover, as in *Sewart*, there was ample testimony that the decedent and Paul had a close relationship. Clark testified that they were always together and that he regarded the decedent as Paul's "father." Paul attended some of the decedent's family events, such as Kathleen's grandmother's funeral. John testified that Paul and the decedent were both invited to his house on holidays. According to Paul, the decedent gave him a gold ring early in their relationship as well as gifts on birthdays and holidays. This evidence supported the trial court's determination that there was a near-familial relationship between the decedent and Paul, and that the presumption of gratuity therefore arose.

¶ 45   Paul has cited to case law from other states to support his argument that the presumption of gratuity should not apply but, as the estate correctly notes, Illinois courts do not look to the law of other states when there is relevant Illinois case law available. *McGill v. Garza*, 378 Ill. App. 3d 73, 76-77 (2007). Considering *White*, *Sewart*, and the testimony about the relationship between Paul and the decedent, the trial court's finding that there was a near-

familial relationship was not against the manifest weight of the evidence. This finding gave rise to the presumption that Paul's services were gratuitous.

¶ 46                                   Whether the Presumption Was Rebutted

¶ 47       Of course, the fact that a presumption arises is not the end of the story; the court must then consider whether the evidence rebuts the presumption. *Heffron v. Brown*, 155 Ill. 322, 326 (1895); *In re Estate of Shea*, 364 Ill. App. 3d 963, 968 (2006) (after determining that a presumption arises, a court must determine whether it has been overcome by the evidence put forward by the opposing party). In addressing this question, Paul first asserts that the presumption of gratuity "diminishes in direct proportion to the remoteness of the degree and character of the family relationship and the character of the duties performed." *In re Estate of Dal Paos*, 118 Ill. App. 2d 235, 240 (1969). Paul argues that, because he was at first a stranger to the decedent, his relationship with the decedent was necessarily "remote" and the presumption therefore loses force. We reject both the factual and the legal aspects of this argument. Factually, regardless of the lack of any initial relationship between Paul and the decedent, the evidence showed that Paul and the decedent developed a close, mutually dependent relationship that was akin to a familial relationship, living and working together for over 25 years. Legally, we note that the only support for this "diminished presumption" statement in *Dal Paos* is *Quigly v. Harold*, 22 Ill. App. 269, 271 (1886), a case that (a) did not itself cite any legal support for the statement, and (b) has no precedential value. See *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 95 (1996). Accordingly, we reject Paul's argument that the presumption of gratuity has limited force because he was at first a stranger to the decedent. Instead, we are guided by the principles of Illinois law below.

¶ 48       Here, the trial court's determination that the presumption of gratuity was not rebutted rested on its finding that Paul "did not present any evidence *** to establish a contract." However, the trial court erred in reducing the issue of whether Paul rebutted the presumption to the question of whether Paul established the existence of a contract. As the court in *White* noted, the presumption of gratuity also may be rebutted by " '[s]uch circumstances as reasonably imply such a contract,' " and there are a variety of factors that may be considered in evaluating whether this standard is met. *White*, 15 Ill. App. 3d at 202. Among the factors that are relevant in determining whether the presumption of gratuity has been rebutted are: an express contract for the services; an "[o]ral promise to leave property by will or an invalid or ineffective instrument showing intention to pay"; the circumstances under which the claimant first began to provide the services; the decedent's "[f]ailure or inability to make return" either in kind or monetarily, "for there ordinarily must be reciprocity in services"; whether the decedent's estate was enhanced by the work performed; whether the claimant performed services that went beyond an express agreement or "[e]xtraordinary services *** not incident to any normal domestic relationship"; and the financial condition of the parties. *Id.* at 202-03.

¶ 49       The evidence here did not establish any express contract between Paul and the decedent relating to Paul's upholstering services. Thus, the first factor does not apply. The second factor potentially could have applied, as Paul attempted to produce evidence of an invalid

-12-

will (the 1996 will) reflecting the intent of the decedent and Kelly that Paul receive something from their estates. However, there are several difficulties with assigning any probative value to the invalid will. The chief difficulty is that the trial court did not permit Paul to lay a foundation for the admission of the invalid will, and in this appeal Paul has not raised any argument that the trial court's rulings on this point were erroneous. Accordingly, he has forfeited any claim that the trial court should have considered the invalid will in determining whether he rebutted the presumption of gratuity. In addition, even if the invalid will had been admitted into evidence, its probative value would be lessened by the fact that it evidently was made in 1996, before Kelly died and a dozen years before the decedent died. Thus, it is possible that in the interim the decedent and Paul reached some other understanding about whether and how Paul should be compensated for his upholstery work. As the invalid will is not in evidence, however, we leave these ruminations aside and find that the second factor was not applicable here.

¶ 50    The third factor, the circumstances under which the claimant first began to provide the services, favors the estate. It is undisputed that, when Paul first began to provide the services, he knew nothing about upholstery and in essence was an apprentice in the decedent's trade. At that time, the training he was receiving in upholstering, when added to the decedent's provision of his room and board, was likely a fair reward for his services. Paul argues that his skills grew to the point that this exchange would no longer have been fair, and indeed he produced evidence to that effect (for instance, John's opinion that, by the late 1980s, Paul was a "master upholsterer," and his own testimony that, after 1999, he became the decedent's "right-hand person" and largely managed the business for the decedent). One of the cases cited by Paul is *Morton v. Rainey*, 82 Ill. 215 (1876), in which the Illinois Supreme Court affirmed the payment of a claim by a nephew of the deceased. The court noted that, although the nephew initially lived with the deceased as if he were the deceased's child, with the deceased providing his room, board, clothing, and medical services, after the nephew came of age he paid his own expenses and farmed on his own behalf. *Id.* at 216. Thus, it held, the presumption that the nephew was acting gratuitously when he farmed the deceased's land for him one year was overcome. *Id.* at 217. Here, by contrast, the evidence showed that Paul remained dependent on the decedent in some respects, receiving his room, board, and medical insurance through the decedent. Moreover, Paul was unable to produce evidence regarding the terms of any new understanding between himself and the decedent, if in fact there was one. Because the initial arrangement between the decedent and Paul was equitable, and there was no evidence regarding any new understanding, this factor favors the estate.

¶ 51    The fourth factor likewise favors the estate. That factor–whether the recipient of the services chose or was able to "make return" either in kind or monetarily–looks at whether the circumstances were such that the recipient could not pay the claimant immediately in some fashion, raising the likelihood that the parties contemplated that the claimant would be paid from the recipient's estate after the recipient's death. Here, the evidence that the decedent continued to acquire real property over the years, including the large home in Wonder Lake, shows that the decedent was well able during his lifetime to pay Paul for his upholstering work. If the decedent did not do so, it is reasonable to infer that he did not wish to.

¶ 52    The fifth factor, whether the claimant's work enhanced the value of the estate, clearly favors Paul. The testimony was undisputed that, by 2004, Paul was the only one performing upholstery for the decedent's business. The tax returns from 2004 and 2005 showed that the decedent's corporation Honora Woods had gross income of between $125,000 and $130,000 in those years, and Ketchmark testified that these figures represented income from the decedent's upholstery business. Accordingly, it is evident that Paul's work enhanced the value of the estate. See *In re Estate of Clausen*, 51 Ill. App. 3d 18, 21 (1977) (the presumption of gratuity was rebutted where, among other things, the decedent benefitted financially by living with his sister).

¶ 53    The sixth factor, whether the claimant performed services of a kind "not incident to any normal domestic relationship" (*White*, 15 Ill. App. 3d at 202-03), also favors Paul. It is uncontested that the professional upholstering services that Paul provided 14 hours per day, 7 days per week, were far beyond the kind of services–*e.g.*, cooking and cleaning–that would be incident to a normal domestic relationship. See *Clausen*, 51 Ill. App. 3d at 22.

¶ 54    As for the final factor listed in *White*, the financial condition of the parties, on balance it favors Paul. The decedent was clearly well off. By contrast, Paul testified that he never had money to go shopping on his own, because he was not paid. On the other hand, the evidence does not indicate that any of Paul's daily living needs went unmet or that he had any significant debts. The parties were not in the same financial condition–the decedent held the purse strings and appears to have made all of the decisions regarding the income from the business. Moreover, Paul testified that he did not obtain a driver's license until after the decedent's death, because the decedent "never let" him have a license. Nevertheless, the evidence does not suggest that Paul was in a position of involuntary servitude or that he served the decedent under financial duress.

¶ 55    Assessing the totality of the *White* factors, we conclude that Paul adequately rebutted the presumption that, because of the near-familial relationship between himself and the decedent, he provided upholstery services to the decedent gratuitously. In this case, the nature of the services was entitled to particular weight, as those services were skilled professional services of the type normally provided by an employee rather than the personal or household services commonly provided by a family member. We note that, when Tammy provided professional bookkeeping services to the decedent, she was paid for them. We can think of no reason to presume that the services rendered by Tammy–someone who indisputably shared a family relationship with the decedent–were not gratuitous, but that other professional services rendered by someone outside the family, over a far greater length of time, were provided gratuitously.

¶ 56    In addition, none of the case law cited by the estate, in support of its position that the near-familial relationship controls here, involved a claimant who provided professional services for a decedent's business. See *White*, 15 Ill. App. 3d at 201 (housekeeping services); *In re Foster's Estate*, 46 Ill. App. 2d at 321 (housekeeping and nursing). Although these cases support the argument that Paul could not recover for the personal services he provided to the decedent immediately before his death, they apply with much less force to Paul's claim for upholstery services. By contrast, *Etherton*, 284 Ill. App. 3d 64, and *In re Estate of Brumshagen*, 27 Ill. App. 2d 14 (1960), the cases on which Paul relies, are more similar to

our case in this regard. Both of those cases involved claimant farmers who provided farming services to the decedents, their neighbors. We think that the nonpersonal nature of the services provided in those cases is one reason that the trial court in each case found that the presumption of gratuity did not apply.

¶ 57    After considering the evidence in this case and the case law described above, we hold that the trial court erred in focusing narrowly on the lack of an express contract in finding that Paul had not rebutted the presumption of gratuity. Nevertheless, as we may uphold a judgment on any ground appearing in the record (*Ultsch v. Illinois Municipal Retirement Fund*, 226 Ill. 2d 169, 192 (2007)), we examine whether the trial court's directed finding in favor of the estate was justified on other grounds.

¶ 58              Presumptions Aside, Did the Claimant Carry His Burden?

¶ 59    Illinois case law follows the "bursting bubble" theory of presumptions: once sufficient evidence has been produced to rebut a presumption, the presumption vanishes from the case and the evidence must be weighed without taking the presumption into account. *Franciscan Sisters Health Care Corp. v. Dean*, 95 Ill. 2d 452, 466 (1983). At that point, the court must consider whether the party having the burden of proof has shown by a preponderance of the evidence that he is entitled to prevail. *Shea*, 364 Ill. App. 3d at 968. Here Paul, as a claimant, bore the burden of establishing his right to recover in *quantum meruit* for the services he provided to the decedent. See *Etherton*, 284 Ill. App. 3d at 68 (trial court may enter a directed finding on the facts where the petitioner fails to carry the ultimate burden of proof).

¶ 60    As the trial court noted in its decision, four elements must be shown to establish a right to recover in *quantum meruit*: (1) that the claimant provided services to the decedent; (2) that the services were not performed gratuitously; (3) that the decedent accepted the services; and (4) that the claimant was not paid for the services. See *Installco, Inc. v. Whiting Corp.*, 336 Ill. App. 3d 776, 781 (2002). The trial court found that the first, third, and fourth of these elements had been proven, and we have no reason to question those findings. The sole remaining question is whether Paul proved, by a preponderance of the evidence, that he did not provide his upholstery services gratuitously. Nongratuitous intent can be shown where the conduct of the claimant demonstrates that he performed the services in exchange for payment and that he expected to receive such payment. *Milborn*, 122 Ill. App. 3d at 691-92.

¶ 61    Here, that evidence is lacking. There is no evidence in the record establishing Paul's own understanding of the arrangement between the parties, or what his expectations were with regard to payment for his upholstery services. Although the Act prevented Paul from introducing certain evidence, the Act would not have barred testimony about his own beliefs and understandings: they were not conversations or events taking place in the presence of the decedent. Nevertheless, no such evidence was presented. Nor did John, or any of Paul's other witnesses, testify that Paul expected payment, or testify about any intent by the decedent to pay Paul. There simply is no evidence in the record that Paul expected to receive anything from the decedent for his upholstery services beyond his room and board.

¶ 62    Although it could be argued that it is common sense that no one would labor for decades in the services of another without expecting payment, the length of time during which the

services were provided can cut the other way as well. As noted above, once Paul became skilled at upholstering, he was free to take his skills elsewhere if he wished. The fact that he did not do so, continuing to work for the decedent for over 25 years, gives rise to a reasonable inference that Paul did not object to the decedent's apparent failure to pay him.

¶ 63 We find one of the cases cited by the estate apposite in this regard. In *McRoberts v. Estate of Kennelly*, 52 Ill. App. 2d 34 (1964), a doctor filed a claim against the estate of one of his patients for services he provided to the patient during the five years before the patient's death. *McRoberts*, 52 Ill. App. 2d at 35. The doctor was not related to the decedent, and there was no suggestion that the presumption of gratuitous service by family members should apply. Instead, the ordinary presumption applied: that the services were nongratuitous. *Id.* at 37. However, the trial court found, and the appellate court affirmed, that this presumption was rebutted by evidence that the doctor had never intended to charge the decedent for his services. The doctor had treated the decedent without charge throughout the years, never sent him a bill, and did not list the decedent among his accounts receivable, although he listed his other patients' charges and payments in his accounts. *Id.* at 37-38. Instead, the doctor kept the decedent's records separately, as the doctor also did for priests, nuns, and ministers–others whom the doctor also did not charge for his services. *Id.* at 38. In denying the doctor's claim against the estate, the court cited with approval a Rhode Island case, *Wright v. Sheldon*, 53 A. 59 (R.I. 1902) (*per curiam*), in which the court refused to allow a claimant to recover for minor services rendered to the decedent over a 30-year period, stating:

"When relations of this character have been so long continued without any contract for payment, *** the natural presumption is that the service was rendered as a friendly act, and it is too late to bring in a charge for such service after it has ended." *Id.* at 59.

Here, Paul provided his upholstery services to the decedent for decades without any contract for payment (or at least, Paul did not provide any evidence of such a contract or its terms). Nor was there any evidence that Paul billed the decedent for his services, or even kept contemporaneous records of his labor on behalf of the decedent's business. Although Paul's services were by no means minor (as were the services at issue in *Wright*), there was no evidence of any circumstances that would have prevented Paul from leaving the decedent's employ if the arrangement between them was not to Paul's liking. Viewing the record as a whole, we find that the trial court did not err in finding that Paul failed to carry his burden of proving that his services were not provided gratuitously.

¶ 64 The estate raises several other arguments for why we should uphold the judgment in its favor, but given our holding we need not address them. For all of the foregoing reasons, we affirm the judgment of the circuit court of McHenry County.

¶ 65 Affirmed.

¶ 66 JUSTICE McLAREN, dissenting:

¶ 67 I submit that the trial court's rationale for granting the motion for a directed finding at the close of Paul's case is inconsistent and contradictory; simply put, it is an oxymoron.

¶ 68     The trial court began its rationale on the *quantum meruit* claim by giving Paul "the benefit of the following presumption: 'The law presumes [that] services knowingly and voluntarily accepted by a decedent during the decedent's lifetime from nonfamily claimants [were] performed with an expectation of receiving compensatory payment.' " *Supra* ¶ 29. However, later in its rationale, the trial court found that Paul was essentially a family member such that it applied the presumption that family members provide services gratuitously. To my knowledge, there was no explanation of why the first presumption was overcome by evidence that Paul was a family member. Indeed, the majority fails to explain or analyze how the first presumption was overcome. Paul never claimed that he was a family member, and it was not his burden to establish that he was not a family member. The majority is silent as to how the first presumption is overcome and supplanted by the presumption that family members provide services gratuitously when the latter presumption does not appear to relate to claims for compensation for labor outside the domestic realm. I submit that the trial court and the majority are enlarging the presumption of gratuitous provision of services by "family members" beyond the bounds of domestic caretaking. The provided services at issue in both *White* and *Sewart* were strictly domestic in nature. See *White*, 15 Ill. App. 3d at 201; *Sewart*, 274 Ill. App. 3d at 310. Here, while Paul sought approximately \$7,800 for caretaking services provided, he sought almost \$388,000 for upholstery services provided. The majority makes no distinction between these different types of services in concluding that "there was a near-familial relationship between the decedent and Paul, and that the presumption of gratuity therefore arose." *Supra* ¶ 44. It is only later, in analyzing whether this presumption of familial gratuity had been rebutted, that the majority notes the fact that the upholstering services that Paul provided "were far beyond the kind of services–*e.g.*, cooking and cleaning–that would be incident to a normal domestic relationship" and that such a fact "favors Paul." *Supra* ¶ 53. The different types of services provided require separate analyses regarding the existence of a "family" relationship, especially given the nearly 50-to-1 disparity in the values of the services provided.

¶ 69     Further, considering the lack of evidence indicating that Paul was actually paid for his labor as a master upholsterer when at least one family member, Tammy, was paid for the services that she provided to the decedent's business, the majority creates an anomaly where the perception is that the unrelated plaintiff is treated as a more intimate family member by the decedent than related family members were. That is a contradiction based upon the evidence as opposed to the enigmatic application of conflicting presumptions. Based upon the present posture of the case, I believe that this element of the *quantum meruit* claim (that he did not perform the services gratuitously) was established by the application of the first presumption by the trial court and that the evidence presented did not alter the validity of that presumption. I believe that the cause should be remanded and that the estate should be required to establish that either or both of Paul's services (as an upholsterer and as a domestic helper) was done gratuitously. Considering the evidence regarding how the decedent treated his own family, it would at least appear that consistency should rebut the conclusion that an unrelated person alleged to be a near-family member should be treated no differently than related family members, if the second presumption is to be applied. Since Tammy was paid for labor outside the residence, so should Paul.

¶ 70    Paul was not a family member, either by affinity or consanguinity. Moreover, the decedent, in matters relating to nondomestic assistance, paid his family members for their assistance. The fact that Paul lived with the decedent does not in any manner establish a familial relationship for purposes of inferring that his nondomestic labor was gratuitous.