2020 IL App (1st) 191432-U

SIXTH DIVISION
September 30, 2020

No. 1-19-1432

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

---

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

---

| | |
|---|---|
| JAMES S. RICHARD, ) | |
| ) | Appeal from the |
| Petitioner-Appellee, ) | Circuit Court of Cook County. |
| ) | |
| v. ) | 18 OP 20709 |
| ) | |
| MARY ANN CHO, ) | Stephanie D. Saltouros, |
| ) | Judge Presiding. |
| Respondent-Appellant. ) | |

---

JUSTICE CONNORS delivered the judgment of the court.
Justices Harris and Griffin concurred in the judgment.

**ORDER**

¶ 1    *Held:*   The two-year order of protection entered against respondent and in favor of petitioner was not moot, unnecessary, or excessive; affirmed.

¶ 2    Petitioner James Richard filed for an order of protection against respondent Mary Ann Cho, claiming months of harassment including hundreds of telephone calls to both him and his family members, as well as to his place of employment. The trial court granted the order of protection. Cho appeals, contending that the two-year order of protection is: 1) moot and unnecessary, and 2) excessive. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    On December 27, 2018, Richard filed a petition for an order of protection against Cho. In that petition, Richard indicated that there had been "thousands of phone calls to work and cell" to him, his wife, his work colleagues, and several friends. He stated that Cho had rear-ended his car, thrown a brick through his basement window, and threatened to kill him and his family. Cho was emailing him, his work partner, and his wife. Richard claimed that it was causing fear for himself, his friends, and his family. Attached to the petition was the following statement:

> "There have been many incidents of Mary Ann Cho showing up at my house, the train station, and Sunset Ridge Golf Course uninvited and was waiting for me at these places. She often will park on my street and at the park nearby. When I don't respond to phone calls because I have repeatedly asked her to stop contacting me, she will call my work phone repeatedly or even my partner's phone at work. The behavior is escalating to the point on November 26 at 2 a.m. she threw a brick through my basement window.
>
> Prior to that on around November 7, she rear-ended my car causing significant damage to both her car and mine.
>
> I did not report these events because I felt eventually it would end and I actually did not want to cause any issues. She simply will not stop contacting or threatening myself and my family, she is also threatening to continue to contact my work in order to cause as much damage [as possible]."

¶ 5    The petition named Richard, his wife, and their three daughters as those seeking protection under the order, and named New Trier High School, Sunset Ridge School, and the Chase office at 21 South Clark Street in Chicago as places that Cho should be prohibited from

entering or remaining present at. The petition further requested that Cho be prohibited from "posting to and/or about [Richard] on all social media or contacting coworkers and friends of [Richard]."

¶ 6    On the same date, the court issued an emergency order of protection, finding that Richard had been harassed and that there had been interference with personal property. The court noted that Cho had created a disturbance at Richard's place of employment, had made repeated calls to work and to his cell phone, had committed repeated surveillance, had repeatedly followed Richard, and had made repeated threats to harm or kill Richard. On December 30, 2018, Cho was served with the emergency order of protection.

¶ 7    On January 16, 2019, the court issued a default plenary order of protection when Cho did not appear for the hearing, which was to remain in effect until January 16, 2021.

¶ 8    On February 19, 2019, Cho filed a *pro se* "motion to vacate default order of protection." Cho argued in her motion that she did not appear on January 16, 2019, because the document that was served to her on December 30, 2018, did not have a date, time, or location indicated on the form. Cho stated that she learned of the judgment on February 14, 2019, and filed the motion to vacate as soon as possible thereafter.

¶ 9    On March 5, 2019, the trial court extended the emergency order of protection until April 4, 2019, and set a status hearing on the plenary order of protection for that same date. The order stated that the plenary order of protection "is vacated," and the emergency order of protection is "re-instated effective immediately."

¶ 10    The status hearing on the plenary order of protection was continued several times before taking place on June 25, 2019. At the start of the hearing, the court read into the record stipulations between the parties, which were as follows: 1) Cho called Richard 230 times

between November 24, 2018, and December 7, 2018; 2) on November 7, 2018, there were 24 calls between 4:12 p.m. and 6:08 p.m.; 3) on December 12, 2018, Richard forwarded all of Cho's calls to Cho's father; 4) on December 12, 2018, there were 32 calls in one hour and ten minutes, then there was a break in time, and then 15 calls in 50 minutes; 5) on December 27, 2018, Richard forwarded Cho's calls to Cho's father; 6) on December 27, 2018, there were 33 calls in a one-hour period; 7) a police report from November 24, 2018, where Cho was pulled over and told not to go near Richard's home; 8) a police report concerning an incident on November 23, 2018, involving telephone harassment and a brick thrown through Richard's window, but Richard said he did not know who threw the brick; 9) a police report dated December 27, 2018, for phone harassment as well as Cho indicating that Richard owed her money, which was "a common thing throughout the reports as well."

¶ 11    Richard testified that he had a relationship with Cho for about five years, during which time Richard was married. Within a 12-month period, there were over 5,000 calls received from Cho. The calls were made to both Richard's work phone, at JP Morgan Securities, and his cell phone. On the night of November 7, 2018, Richard was driving home from work and saw Cho at a park near his house. He pulled over and said, "what are you doing. Get the hell out of here." Richard testified that she then followed him in her car, and while he was stopped at a stop sign, she rear-ended his car. He did not report it to the police.

¶ 12    Richard testified that when he was in California visiting relatives, calls from Cho persisted and when he answered, she said she was going to burn down Richard's house. At another time, when Richard was at the airport, Cho called and asked where Richard was going. Richard would not tell her, and things escalated. Cho stated that she was going to slit one of Richard's daughter's throats. She also stated that she was going to have "your wife's blonde hair

drenched in blood, or something to that effect." Richard did not make a police report concerning those threats.

¶ 13    On December 27, 2018, Richard filed harassment charges against Cho at the police station and filed for an order of protection against Cho in the trial court. On December 29, 2018, there was a memorial service for Richard's dad. Later that evening, Cho was parked in front of Richard's house. Richard called the police, and he saw police officers take her away in a squad car.

¶ 14    On February 14, 2019, Richard requested the court to dismiss the two pending harassment charges that he had previously filed against Cho. Richard testified that at that time, the emergency order of protection that had been issued on December 27, 2018, was still in effect, and he wished for it to remain in effect.

¶ 15    On March 12, 2019, Richard was at Ogilvie train station and Cho approached him and said they had to talk. Richard said there was nothing to talk about, and that their lawyers could talk. Richard testified that it got loud, and that someone who worked at Ogilvie asked if there was a problem. Cho then left. When she walked away, Richard took a picture of her with his phone to document the fact that she had approached him at Ogilvie. Cho then came back and grabbed Richard's phone and demanded his passcode. She then left with Richard's phone. Richard told her if she did not give it back, he was going to file theft charges, at which point Cho gave his phone back.

¶ 16    Richard testified that he has blocked Cho's telephone number and that he has forwarded her calls to Cho's father. After forwarding her calls, Cho emailed Richard telling him to stop involving her family and that she was going to "ruin" him.

¶ 17    On cross-examination, Richard testified that he knew Cho from work, and that they had worked together for almost ten years. They met at Merrill Lynch, and then went together to Credit Suisse, and then independently to JP Morgan. Richard admitted that in some of those companies he was Cho's supervisor, and that he managed some of Cho's money. Richard testified that managing her money was against the policy of the company that held Cho's IRA. Richard testified that he got in trouble with the bank because of this, and that there was a conduct hearing and he was reprimanded. Richard admitted that Cho cashed in that IRA and lent the cash to Richard, which was also against the bank's policy.

¶ 18    Richard further testified that his family knew Cho, and that Cho used to babysit his children. Richard and Cho had a sexual relationship during Richard's marriage, and Richard admitted to having sexual relations with her "around Ogilvie," at the country club by his house, and in his home.

¶ 19    Richard testified that on November 23, 2018, he was sleeping in his basement when the brick was thrown the basement window. Richard stated that he did not have a picture of his car after Cho rear-ended him, and that he did not file a police report. He had seen her before that incident at the park, which is a place that he and Cho had sexual relations "on occasion."

¶ 20    Richard stated that he dropped the harassment charges against Cho on February 14, 2019, on his own free will.

¶ 21    Richard further admitted that in November 2018, he was still engaged in sexual relations with Cho. He also admitted that he sometimes picked up the phone when Cho called him repeatedly. He stated that he talked to her on the phone in both November and December of 2018.

¶ 22    Richard admitted that he said through text messaging that it was going to be "World War 3," and that she was going to "go down in flames." He stated that he texted with her in November and December of 2018.

¶ 23    On redirect examination, Richard stated that he would eventually pick up the phone when Cho was calling repeatedly because sometimes it was his work phone and it was disruptive. He further stated that he dropped the criminal charges against her because it was their understanding that she would stop calling if he did that.

¶ 24    Cho testified next. She testified that she and Richard had worked together for 12 years. They met at Merrill Lynch. Richard then asked her to join his team to move to Credit Suisse. Cho admitted that at one point, Richard was in charge of her IRA which was against JP Morgan's policy. Cho stated that it was also against JP Morgan's code of conduct for a broker to take money from an account and use it as a loan. Cho testified that in 2015, she knew Richard and his family were "in a bind" for awhile so she was trying to help. She cashed her IRA and transferred the money without the bank finding out. Cho stated that she had gotten the majority of the money paid back to her, but that on December 10th, when she and Richard met at the Renaissance Hotel, they argued because there was still about $4,000 left in back taxes and penalty fees because she had to pay "a lot based on my income and the early withdrawal."

¶ 25    Cho testified that at no time did she make any threats to Richard or his family in November, December, January, or February, but that they did get into heated arguments. She never threw a brick through his basement window. She never hit his vehicle. She used to work at the Merrill Lynch office across the street from Ogilvie, and on the day that she saw Richard there, she was meeting a friend at one of the train station bars. She saw him take a picture of her and "knew he was setting me up."

¶ 26    Cho stated that her relationship with Richard was "like a rollercoaster," and that at the end she did not trust what was going on with Richard and his wife. Richard told her nothing was going on, and then she would find out that he and his wife were together. She believes that Richard was using this proceeding to get back at her, and that he was "afraid I'm going to counter-sue him."

¶ 27    Cho testified that somebody called her work four months after her first arrest and notified her work of the arrest. She was asked why she had not disclosed it to her work, to which she responded that she did not think it was necessary because it was not securities related. Cho is currently on disability from work and has not gotten paid in four months.

¶ 28    Cho stated that she does not want to harm Richard, his wife, his kids, or his dog. She has apologized via email to his wife, and she no longer cares about the money.

¶ 29    On cross-examination, Cho stated that in her conversations with police officers on December 27, 2018, she told them that Richard owed her money, and that she would handle it. She did not want to sue him because she did not want it to negatively impact his job.

¶ 30    Cho testified that after being arrested on November 24, 2018, she continued to call Richard, but that he called her as well and they would talk late at night. She would call repeatedly if he ignored her in the middle of an argument and stopped answering her calls. She would sometimes call without caller ID because she did not like being blocked and felt dismissed in the middle of an argument or that she was being disrespected.

¶ 31    On redirect examination Cho stated that Richard picked up some of the calls from her in November and December, and that he would also text her back.

¶ 32    After hearing all the testimony, the trial judge stated:

8

"I've heard all of the testimony here today, and my finding, quite honestly, is based on the credibility of the witnesses and the demeanor of everyone present here today.

I do believe there was a five-year relationship between the parties that was probably toxic throughout most of it. However, during [Cho's] testimony, she indicated that when she knew she was being blocked, she would still call because she was not going to be ignored. She was not going to be disrespected. She was told by the Northfield Police Department to basically stay away from this man, and she didn't do it because she was not going to be ignored. She was going to call until he picked up the phone and spoke to her.

I have an enormous amount of phone calls here that [Cho] made to [Richard], which were stipulated to, 230 times.

I do believe [Richard] when he said he kept going back with her because it was the lesser of two evils because she just would not leave him alone, and that was the easier of the two things to do.

I believe the respondent's behavior constitutes harassment. I believe her conduct is not necessary to accomplish a purpose that is reasonable under the circumstances that would cause a reasonable person emotional distress – that does cause emotional distress to [Richard]. But I also believe when he said that [Cho] threatened him with physical force and threatened his family with physical force, and that was also a basis for the harassment.

So based on these two conditions, I find that the burden has been met. It has not been rebutted by a preponderance of the evidence. That is due solely to

9

[Cho's] testimony here today, because she said a couple of things that were quite telling. Basically that she's not going to be ignored, and I think that's what led to this constant harassment of this person.

So I'm finding for the petitioner, and I'm issuing a two-year plenary order of protection against you."

¶ 33    The trial judge also stated to Richard:

"I want to be very clear about this. I'm giving you this order of protection, but it goes both ways. You are absolutely under no circumstances to contact this woman for any reason; not a phone call, not an email, not a text, not hey do me a favor, call Mary Ann for me, nothing. Because if I find out that there's proof that you've done that, this will immediately disappear for you.

Do you get that?"

¶ 34    A plenary order of protection was entered in favor of Richard and his family, against Cho. It also protected Gus, the family's dog. Cho was prohibited from going on the family's property, as well as from entering or remaining at the schools that Richard's children attended, as well as Richard's place of work. Cho was further ordered to not make any posting to and/or about any of the protected parties on any social media or online. The order lasts for a period of two years, until June 25, 2021. Cho now appeals the two-year order of protection.

¶ 35                              II. ANALYSIS

¶ 36    On appeal, Cho contends that: 1) the order of protection was unnecessary and moot, and 2) the duration and scope of the order of protection was excessive. Richard did not file a response brief.

¶ 37    Before we address the merits of Cho's brief, we first must address its adherence to the requirements set forth in Illinois Supreme Court Rule 341. Ill. S. Ct. R. 341 (eff. May 25, 2018). Rule 341 provides that the appellant's brief shall contain an argument section, which shall contain the contentions of the appellant and the reasons therefore, "with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). We note that Cho's argument section does not contain any citations to the record and only three citations to caselaw – one of which was for the standard of review, and one of which was a New York case. As we have explained:

> "Our rules are not merely suggestions. Consequently, Rule 341's mandates
> detailing the format and content of appellate briefs are compulsory. *** Where an
> appellant's brief contains numerous Rule 341 violations and, in particular,
> impedes our review of the case at hand because of them, it is our right to strike
> that brief and dismiss the appeal. Ultimately, we are not a depository in which the
> appellant may dump the burden of argument and research for his cause on
> appeal." [Citation marks omitted]. *Rosestone Investments, LLC v. Garner*, 2013
> IL App (1st) 123422, ¶ 18.

¶ 38    It is axiomatic that a reviewing court is entitled to have the issues clearly defined and supported by pertinent authority and cohesive arguments. *Marzouki v. Najar-Marzouki*, 2014 IL App (1st) 132841, ¶ 12. In light of these principles, we are entitled to strike Cho's brief or dismiss her appeal, but we choose not to do so in this case and will address the issues to the best of our ability. *Id.*

¶ 39    The Illinois Domestic Violence Act of 1986 (Act) (750 ILCS 60/101 *et seq*. (West 2018)), states that if the court finds that a petitioner has been abused by a family or household

11

member, an order of protection prohibiting the abuse shall issue ***." 750 ILCS 60/214(a) (West 2018). Family or household members include "persons who have or have had a dating or engagement relationship." 750 ILCS 60/103(6) (West 2018). "Abuse" means physical abuse, harassment, intimidation of a dependent, interference with personal liberty or willful deprivation. 750 ILCS 60/103(1) (West 2018). "Harassment" means:

"knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner. Unless the presumption is rebutted by a preponderance of the evidence, the following types of conduct shall be presumed to cause emotional distress:

(i) creating a disturbance at petitioner's place of employment or school;

(ii) repeatedly telephoning petitioner's place of employment, home, or residence;

(iii) repeatedly following petitioner about in a public place or places;

(iv) repeatedly keeping petitioner under surveillance by remaining present outside his or her home, school, place of employment, vehicle, or other place occupied by petitioner or by peering in petitioner's windows;

(v) ***

(vi) threatening physical force, confinement or restraint on one or more occasions." 750 ILCS 60/103(7) (West 2018).

¶ 40    The Act instructs the trial court, as the trier of fact, to decide whether the respondent has abused the petitioner by the preponderance of the evidence. 750 ILCS 60/205(a) (West 2018). When a trial court makes a finding of fact by a preponderance of the evidence, a reviewing court

defers to the trial court, and so decides only whether the finding is against the manifest weight of the evidence. See *Best v. Best*, 358 Ill. App. 3d 1046, 1053 (2005). Applying a manifest weight of the evidence standard, we will reverse the trial court's decision only if the opposite conclusion is clearly evident or the determination is unreasonable, arbitrary, or without basis in the evidence presented. *Id*. at 1054. We will not substitute our judgment for the trial court's regarding the credibility of witness, the weight it should have given to the evidence, or the inferences it should have drawn. *Id*. at 1055.

¶ 41    On appeal, Cho does not contend that the trial court's finding that she harassed Richard was against the manifest weight of the evidence. Rather, she argues that the order of protection was moot and unnecessary because a default plenary order of protection had been entered on January 16, 2019. Cho argues that because the order of protection, which had been entered on January 16, 2019, was in place until January 16, 2021, there was no "factual need" for a hearing on June 25, 2019. She specifically states in her brief that the trial court "erred in not vacating the [January 16, 2019] order of protection."

¶ 42    However, the trial court *did* vacate the January 16, 2019, order, per Cho's request. The January 16, 2019, default order of protection was entered when Cho did not appear in court. On February 19, 2019, Cho filed a *pro se* "motion to vacate default order of protection." Cho argued in her motion that she did not appear on January 16, 2019, because the document that was served on her on December 30, 2018, did not have a date, time, or location indicated on the form. Cho stated that she learned of the judgment on February 14, 2019, and filed her motion to vacate as soon as possible thereafter.

¶ 43   On March 5, 2019, the trial court did as Cho requested and vacated the plenary order of protection. The trial court then reinstated the emergency order of protection that had been in place prior to the January 16, 2019, court date and set a status hearing date of April 4, 2019.

¶ 44   Cho contends that she was "lawfully observing the [January 16, 2019] order," when she unexpectedly encountered Richard at the train station on March 12, 2019, and that such an isolated incident should not have extended the protection order. However, the incident that occurred at the train station did not "extend" the January 16, 2019, protection order. That order had been vacated, upon Cho's request, and a new hearing date was scheduled so that Cho would have a chance to be heard. Accordingly, we find that there is absolutely no merit to Cho's argument that the trial court "erred in not vacating" the January 16, 2019, default order – because the trial court *did* vacate that order – and the incident at the train station therefore did not extend that order because that order was no longer in place at the time of the incident.

¶ 45   Cho's second argument on appeal is that the order of protection was excessive. She contends that the duration of the order of protection should have been three months instead of two years, because she never acted on her physical abuse threats, and was not a "clear and present danger" to Richard. Specifically, she states that "orders of protection require proof of a clear and present danger to the petitioners," but she "cannot cite specific caselaw Illinois authority as such, but this is fundamental and common sense, in light of the legislative purpose of orders of protection." Instead, she cites to *In re Kristen G.*, 143 A.D. 3d 614 (2016), a New York case. However, "Illinois courts do not look to the law of other states when there is relevant Illinois case law available." *In re Estate of Walsh*, 2012 IL App (2d) 110938, ¶ 45.

¶ 46   Under the Act, there is simply no "clear and present danger" language, and we are unwilling to read that into the statute as a prerequisite to obtaining an order of protection. Where

a statutory enactment is clear and unambiguous, a court is not at liberty to depart from the plain language and meaning of the statute by reading into it exceptions, limitations, or conditions that the legislature did not express. *Relf v. Shatayeva*, 2013 IL 114925, ¶ 29. The Act states that if a court finds that a petitioner has been abused by a family or household member, as was the case here, an order of protection prohibiting that abuse shall be issued. 750 ILCs 60/214(a) (West 2018). A plenary order of protection entered under the Act "shall be valid for a fixed period of time, not to exceed two years." 750 ILCS 60/220(b) (0.05) (West 2018). Because the order of protection against Cho does not exceed two years, we do not find that it was excessive.

¶ 47                                III. CONCLUSION

¶ 48    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 49    Affirmed.